*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0143

D.W., APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2017-CF2-014804)

(Robert A. Salerno, *Judge*)

(Argued en banc December 10, 2025                    Decided July 2, 2026)

*Jaclyn S. Frankfurt*, Public Defender Service, with whom *Samia Fam*, *Dennis Martin*, *KC Bridges*, *Mikel-Meredith Weidman*, and *Victoria Hall-Palerm*, Public Defender Service, were on the briefs, for appellant.

*Mark Hobel*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney at the time the brief was filed, *Matthew M. Graves*, United States Attorney at the time the supplemental brief was filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Amy Joy Thomas*, *Chrisellen R. Kolb*, and *John P. Mannarino*, Assistant United States Attorneys, were on the briefs, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, BECKWITH, EASTERLY, MCLEESE, DEAHL, HOWARD, and SHANKER, *Associate Judges*, and GLICKMAN, *Senior Judge*.

Opinion for the court by *Associate Judge* DEAHL, with whom BLACKBURNE-RIGSBY, *Chief Judge*, EASTERLY, HOWARD, and SHANKER, *Associate Judges*, and GLICKMAN, *Senior Judge*, join.

Opinion concurring in the judgment by *Associate Judge* MCLEESE at page 28.

Dissenting opinion by *Associate Judge* BECKWITH at page 44.

DEAHL, *Associate Judge*: Appellant D.W. was standing with a group of six other people outside the Geraldine apartment complex one afternoon. The group was hanging out near one of the complex's breezeways, near the end of a long walkway that ran about 100 feet to the public sidewalk in front of the complex. A police cruiser with four officers stopped near the entrance to that walkway, and two uniformed officers exited the car and started toward it.

Within two or three seconds, right as the officers stepped onto the walkway, D.W. and one of the other men in the group saw the approaching officers and took off running. The officers chased D.W. for about a minute, following him through a parking lot, down an alley, and through a nearby home's rear and side yard to a tall chain-link fence that D.W. scaled. The initially pursuing officers gave up the chase at that point, but a different officer jumped the fence after D.W. and managed to grab his leg as he was trying to hop over a second tall fence. D.W. dropped a gun as he was being apprehended. D.W. was charged with several firearm-related offenses and, after the trial court denied his motion to suppress the gun, he was convicted of all counts at a stipulated trial. D.W. appealed his convictions, and a panel of this

court vacated them on the grounds that officers lacked reasonable suspicion to seize D.W. *See D.W. v. United States*, 339 A.3d 175, 182-83 (D.C. 2025). This court sua sponte granted en banc rehearing and vacated that opinion. *D.W. v. United States*, 341 A.3d 27, 27 (D.C. 2025).

We now hold that the officers had the requisite reasonable articulable suspicion to justify their seizure of D.W. when they grabbed his leg. We reach that conclusion largely because D.W. ran upon the mere sight of police officers approaching from a substantial distance, with little indication that they were intent on stopping, searching, or even questioning him in particular. D.W. had not been singled out in any way and, to that point, had little reason to think he could not simply go about his business. The desperation of D.W.'s flight, in which he scaled two tall fences, and the testimony that at least "five to ten" "violent crimes" occur per year at this particular apartment complex further supports our conclusion. Considering those circumstances in their totality, we conclude that D.W.'s seizure was supported by reasonable articulable suspicion, so that the trial court correctly denied his suppression motion. We thus affirm D.W.'s convictions.

## I. Background

One August afternoon, several uniformed officers in the Metropolitan Police Department's Crime Suppression Team drove to the Geraldine apartment complex

in Southeast D.C. on "routine patrol" as part of their "normal, everyday operations." The officers were not responding to a specific call or report of criminal activity. They were there "just to check the area" for "any type of illegal activity," as they had done before on numerous occasions, believing the Geraldine to be a "high-crime area." A police cruiser with four officers in it stopped at the entrance of a long walkway that ran from the sidewalk to the entrances of three apartment buildings in the complex. The walkway also led to a breezeway—a passageway through two of those buildings—that was a bit past those building entrances. D.W. was hanging out with six other individuals near that breezeway. There did not appear to be any other people outside in that part of the complex. Officers Dmitry Gendelman and John Bewley exited the car and approached the walkway.

Below is a screenshot from Officer Gendelman's body worn camera footage just before D.W. and another man broke off from the group and sprinted away from the officers. To highlight a few details, two of which come into clearer focus as the video progresses: (1) Bewley is in the forefront of the footage a few feet from the walkway; (2) one entrance to the apartment buildings is to the left of the walkway about halfway up, a second is straight ahead, and a third is to the right, though it is obscured by some bushes here; and (3) several individuals are gathered near the breezeway, which is to the left of the entrance that is straight ahead, though they are barely visible in this screenshot. Gendelman is about 100 feet from the breezeway at

this point in our estimation, *see infra* note 3, though there was no finding about the precise distance in the record aside from testimony that the officers were "pretty far away." *D.W.*, 339 A.3d at 178.



Within about a second of the above—as the officers stepped onto the walkway—D.W. and an otherwise unidentified man in a blue shirt took off running through the breezeway, with D.W. running at a "full sprint." The two officers ran after the men. As the officers approached the breezeway, four of the five people who remained did not react in any noticeable way, but one man lifted his shirt as if to show that he had nothing in his waistband. The officers ran by that group and through the breezeway, then chased the fleeing men through a small parking lot, down an

alley, and through the rear and side yard of a nearby home. D.W. effectively eluded Gendelman and Bewley after about forty-five seconds when he jumped a tall chain-link fence that was about six feet high.

At that point, Officers Gendelman and Bewley both turned their attention to the man in the blue shirt, who had stopped running near the front door of a nearby house and put his hands up as the officers apprehended him. Gendelman handcuffed the man, lifted his shirt, patted down his "crotch area" for weapons, and left him handcuffed in public view as officers canvassed the area for any discarded contraband. That man was ultimately released after officers apparently found nothing incriminating on him or in his flight path.

Turning back to D.W.: While he escaped Gendelman and Bewley by scaling a tall chain-link fence, a third officer on the scene, Krishaon Ewing, was not so easily evaded. Ewing had arrived at the complex in a second cruiser parked outside the view of those in the breezeway. After hearing calls about the ongoing chase, Ewing ran through the complex and got close to D.W. just after he climbed over the first tall fence. Ewing then likewise scaled the fence and chased D.W. for another fifteen seconds or so until D.W. tried to scale a second tall fence. Ewing grabbed D.W.'s right leg as he reached the top of that fence and repeatedly shouted "Stop" and "I'm not letting go," at which point D.W.'s pants got snagged on the fence. Ewing then

saw D.W. pull out a firearm from his pants and drop it on the ground. Several other officers caught up to the pair within seconds, helped dislodge and apprehend D.W., and recovered the firearm that D.W. dropped.

At the suppression hearing, Officers Bewley and Ewing testified to the above facts and to their views that the Geraldine complex was a "high-crime area." Bewley did not know exactly how many violent crimes had occurred at the complex in the previous year or two but agreed it was "common knowledge" among MPD officers that it was a high-crime area, which he described as an area where "five to ten" or more "violent crimes" occur per year. According to Bewley, the complex was "known for drug trafficking, drug sales and gun violence," and he had personally responded to reports of homicides and assault with a dangerous weapon there. When asked if he would consider the Geraldine a high-crime area if "hypothetically" there were only "four violent crimes" there in the past year, Bewley said "[n]o."

Bewley also testified that he had performed searches of men at the complex before and that those searches typically involved checking their "crotch area" in the same manner that Gendelman had searched the man in the blue shirt before releasing him. Bewley further agreed that suspects who are stopped might be handcuffed and detained in plain view of the public, as the man in the blue shirt was, and forced to wait there for "possibly" thirty minutes, and "quite possibly" an hour or more if

that's how long it took to complete a sweep of the surrounding area. Bewley also agreed it was "typical for some men" to put their arms out in a T-shape or lift their shirts when officers approach them at the Geraldine.

As for Ewing, he had made "a lot of arrests" and recovered "numerous" firearms and narcotics at the complex in the past, and he said it had a "reputation" as a high-crime area, which he described as an area where officers "consistently do drug busts . . . [and] recover firearms" and where "multiple shootings and stabbings have occurred." Like Bewley, Ewing had seen people at the Geraldine lift their shirts to expose their waistbands in response to approaching officers before, though he would not venture a guess about how many times he had seen that behavior. While he testified that there were some generic "complaints" about "drug activity" in front of the complex, he did not know if there were any complaints on the day D.W. was arrested.

According to Ewing, when he first arrived at the complex, he began speaking to people mingling outside about those generic complaints. As depicted in Ewing's body worn camera footage, which initially captured no audio, three people in the area where he arrived simply went about their business with no apparent reaction to him. Ewing then approached another group of four people a bit further down the block. One man in that second group, after some verbal exchange with Ewing, put

his arms straight out to his sides (forming a T-shape) just as Ewing's camera began capturing audio. The audio picks up as Ewing says "I'm gonna check and make sure alright," suggesting that Ewing had just asked if the man had any weapons on him, and the man had answered in the negative while holding his arms out to submit to a patdown search. Within a second, before Ewing could conduct that search, Ewing heard another officer's calls indicating there was a chase in the back of the complex. Ewing took off running toward it and eventually caught D.W., as described above.[1]

After hearing the testimony and reviewing the body worn camera footage, the trial court denied D.W.'s motion to suppress, calling it a "very close case." The court found that D.W. was seized when Officer Ewing grabbed his leg, so that the relevant question was whether officers had reasonable articulable suspicion to seize him at that point. The court found that the officers had that requisite suspicion, stressing three factors: (1) D.W.'s "immediate and headlong" flight upon the "mere sight of police"; (2) the fact that his flight was "sustained over a distance" with D.W.

---

[1] D.W. presented one witness of his own at the suppression hearing—a defense investigator. She testified that, based on public crime data, there had been no homicides within 1,000 feet of the Geraldine in the year before D.W.'s arrest, and there had been only one homicide—a stabbing—in the previous three years. The investigator focused her search exclusively on homicides near the Geraldine, however, and she did not look up any information about the prevalence of other violent crimes, gun arrests, or drug offenses at or near the complex, so the trial court found her testimony was of little import.

"jumping fences along the way in an apparent desperation to escape"; and (3) the officers' testimony about the Geraldine being a "high-crime area."

The trial court denied D.W.'s suppression motion and convicted him of all counts at a stipulated trial. He now appeals those convictions, challenging the denial of his suppression motion.

## II. Analysis

The only issue in this case is whether the officers had reasonable articulable suspicion to seize D.W. when Officer Ewing grabbed his leg. We review that question de novo and defer to the trial court's factual findings unless they are clearly erroneous, though our review of the record is not limited to the trial court's express findings. *See Mayo v. United States*, 315 A.3d 606, 616-17 (D.C. 2024) (en banc). That is, in addition to those findings, we may "examine[] other record evidence presented at a suppression hearing to determine whether the government proved that a defendant's constitutional rights were not violated." *Id.* at 617.

Police officers may lawfully stop a person under the Fourth Amendment if they have "reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity." *Id.* at 620 (quoting *Golden v. United States*, 248 A.3d 925, 933 (D.C. 2021)). Although reasonable articulable suspicion

requires "considerably less than proof of wrongdoing by a preponderance of the evidence," *id.* (quoting *Kansas v. Glover*, 589 U.S. 376, 380 (2020)), officers must articulate more than an "inchoate and unparticularized suspicion or hunch of criminal activity," *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Reasonable suspicion is based on the totality of the facts available to the officers at the moment of the seizure. *Mayo*, 315 A.3d at 620 (citing *Terry*, 392 U.S. at 21-22). When assessing the totality of the circumstances, we are required "to consider 'the whole picture,'" cognizant that "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *District of Columbia v. R.W.*, 146 S. Ct. 1069, 1072-73 (2026) (per curiam) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 60-61 (2018)).

We agree with the trial court that three factors, when taken together, provided officers with the reasonable articulable suspicion necessary to justify their seizure of D.W. They are: (1) D.W.'s headlong flight upon the mere sight of officers headed in his general direction from a substantial distance, with no indication that they were focused on him in particular or that he would not be allowed to go about his business; (2) the officers' testimony about criminal activity at the Geraldine complex; and (3) the desperation evinced by D.W.'s protracted and somewhat treacherous flight, including his successful jumping of one tall fence and thwarted scaling of another.

The first factor does the heavy lifting in our analysis, while we accord substantially less weight to the other two factors.

Before fleshing out the importance of those factors, and the counterpoints that D.W. offers, we first provide a primer on this court's recent en banc opinion in *Mayo*. The parties agree that *Mayo* is central to this appeal.

### A. Mayo v. United States

D.W.'s principal argument is that "*Mayo* requires reversal" of his convictions because it established that headlong flight in an area that officers generically describe as "high crime" cannot, without more, provide reasonable articulable suspicion for a seizure. That is too sweeping a reading of *Mayo*, which repeatedly stressed that the "context" of the flight weighs heavily in assessing how incriminating it is, *Mayo*, 315 A.3d at 612, 623, 625-27, 634, as we will further explain below.

In *Mayo*, three officers in MPD's Gun Recovery Unit, or GRU, pulled their unmarked vehicle into an alley in the Kenilworth neighborhood, where a group of at least five people were hanging out. *Id.* at 612-13. As with the present case, the officers were not responding to any report of criminal activity and did not see any criminal activity afoot. *Id.* at 613. At least one of the officers, while still sitting in

his vehicle, immediately focused his attention on Mayo, who had "disengaged" from the core group and begun talking "with a man in a wheelchair" nearby as the officers pulled their vehicle up. *Id.* While Mayo had his back to the officers so that they "could not actually observe Mr. Mayo's hands," Mayo's arm movements suggested his "hands were moving somewhere in front of him near the waistband level." *Id.* at 623-24. That raised the officers' suspicions. The three officers then exited their car as the entire group casually dispersed in reaction to their presence. *Id.* at 614, 622.

Upon exiting their car, the three officers immediately "singled Mr. Mayo out from the already-dispersed group," with two officers walking directly toward Mayo, and the third officer walking parallel to him in a flanking maneuver. *Id.* at 628 (describing "two officers directly behind Mr. Mayo and another taking a parallel path"). Mayo walked away from the officers at first, just as the other individuals in the alley had done. *Id.* at 613, 628. Undeterred, the officers "closed in on him" and said: "Hey, we just want to talk. We just want to talk to you. Do you have any guns?" *Id.* at 628. At that point, Mayo ran away from the converging officers and one of the officers leapt at him and "managed to trip up one of Mr. Mayo's feet," which constituted the relevant seizure in need of justification in *Mayo*. *Id.* at 613.

In analyzing the extent to which those facts contributed to reasonable articulable suspicion, we stressed that flight's incriminating weight "depends on

context." *Id.* at 626; *see also id.* at 627 ("[W]e consider to what degree Mr. Mayo's flight, considered in context, could have been reasonably interpreted by the officers as consciousness of guilt."). The relevant context in *Mayo* was that, just prior to Mayo's flight, the "officers took a series of actions that they should have reasonably understood to communicate to a person in Mr. Mayo's position that they planned to stop him" with no legal justification for doing so, despite his initial attempt to simply walk away. *Id.* at 628. That context severely mitigated any consciousness of guilt that could have been inferred from Mayo's flight. *See id.* at 627-28. And the fact that Mayo had initially walked away from officers likewise did not "significantly bolster the government's showing of articulable suspicion" because that was merely an attempt by Mayo "to exercise his right not to participate in an encounter with police officers." *Id.* at 622 (quoting *Bennett v. United States*, 26 A.3d 745, 753 (D.C. 2011)); *see also Brown v. United States,* 590 A.2d 1008, 1019 (D.C. 1991) ("Citizens have no legal obligation to talk to the police.").

We further explained that those facts were "nothing like" the facts in *Wardlow*, where the Supreme Court held there was reasonable articulable suspicion to seize a fleeing suspect after he "took one look at police officers" driving by him in a police caravan "and ran." *Mayo*, 315 A.3d at 627-28 (discussing *Wardlow*, 528 U.S. at 121-22). *Mayo* stressed that "[f]light is not merely a box that, once checked, automatically justifies a stop." *Id.* at 625 (quoting *Posey v. United States*, 201 A.3d

1198, 1204 (D.C. 2019)); *see also id.* ("[F]light cannot imply consciousness of guilt in all cases." (quoting *Miles v. United States*, 181 A.3d 633, 641 (D.C. 2018))). Unlike in *Wardlow*, where the officers did not seem to be focused or converging on Wardlow before he fled, the officers in *Mayo* "had communicated [to Mayo] that they specifically suspected him," without sufficient basis, "of criminal activity and were targeting him for investigation" prior to his flight, thereby substantially reducing the incriminating value of his flight in the reasonable suspicion calculus. *Id.* at 632.

In *Mayo*, we also reaffirmed "that locational evidence about criminal activity presented by the government can be a relevant consideration" in the reasonable suspicion calculus. *Id.* At the same time, we hastened to "disavow the unhelpful 'high-crime area' label" that had permeated our cases, *id.*, explaining that such "bare" and "conclusory" labels were too generic to be afforded any real weight. *Id.* at 634. We instead explained that "the value of general locational crime information in interpreting potentially suspicious conduct will be a fact-intensive inquiry" that turns on "the quality and specificity of the information, with particular focus on the recency, frequency, and geographic proximity of the relevant criminal activity." *Id.* at 635. The only specific locational evidence offered in *Mayo* was an officer's testimony that his unit had recovered "over 10 guns" in the previous three years in the "Kenilworth area," a neighborhood "of unknown boundaries." *Id.* at 636. That

"weak tea," as we described it, was not "sufficiently specific or well-grounded to place Mr. Mayo's innocuous conduct in a different light or make his flight more indicative of consciousness of guilt." *Id.*

Based on that totality of circumstances considered "collectively," *id.* at 622, 637, we concluded that officers did not have reasonable articulable suspicion to seize Mayo given (1) the circumstances of his flight, which was prompted by the officers' seeming disregard of his attempt to simply walk away from them; and (2) the weak general locational crime testimony. *Id.* at 637.

## B. The Present Case

We reaffirm the principles articulated by this court in *Mayo*,[2] and now turn to the application of those principles to the present case. We first assess the relevant

---

[2] Our concurring colleague, who was the lone dissenter in *Mayo*, incorrectly asserts that this court in *Mayo* utilized a "divide-and-conquer" approach "rather than considering factors collectively." *Post* at 29-30 (McLeese, J., concurring in the judgment). And because the Supreme Court recently reaffirmed the longstanding principle that pertinent factors must be viewed collectively when conducting Fourth Amendment analyses, *see R.W.*, 146 S. Ct. at 1072-73, our colleague argues that we "should be reconsidering *Mayo* rather than reaffirming it," *post* at 30. This critique is unfounded, as our dissenting colleague persuasively explains. *See post* at 44-49 (Beckwith, J., dissenting). The court in *Mayo* expressly and substantively considered the totality of circumstances "collectively," including the flight and the particular details of the "general location[al] crime evidence presented by the government" "taken together" with the other pertinent factors. *Mayo*, 315 A.3d at 622, 637. We did not impose any "threshold requirement" for weighing any factor in the reasonable articulable suspicion calculus, as the concurrence posits, *post* at 31-32,

context of D.W.'s flight, which is quite different from that in *Mayo*, and far more analogous to the context that justified a seizure in *Wardlow*. We then consider the locational crime evidence and the desperate nature of Mayo's flight, though we accord substantially less weight to those factors.

Unlike in *Mayo*, officers had not singled D.W. out before he ran away, nor was it obvious upon their arrival that they were even particularly interested in the group that D.W. was a part of. When D.W. took off sprinting through the breezeway, Officers Gendelman and Bewley had just arrived on the scene and were about 100 feet away from him as they started up the walkway that led both to the breezeway

---

aside from requiring that the evidence be "relevant" and "nonconclusory." *Id.* at 632-34 (rejecting the bare "high-crime area" label because it invites a non-fact-specific analysis). Those are requirements that *R.W.* itself reiterated. 146 S. Ct. at 1071 (requiring a "'*particularized* and objective basis'" for suspecting criminal wrongdoing (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (emphasis added))). We instead explained why, under the particular circumstances in *Mayo*, we attached little weight to the incriminating force of the flight and general locational crime evidence both as standalone factors and when viewed in combination with the totality of other circumstances. Our concurring colleague "do[es] not object to courts initially considering the general significance of individual factors before considering the totality of the circumstances," *post* at 34, and while those individual factors will "often [be] greater than the sum of [their] parts," *R.W.*, 146 S. Ct. at 1072, that is not invariably so. An insignificant standalone factor, like the paltry evidence of Kenilworth being a "high-crime area" in *Mayo*, might be just as insignificant when considered alongside other factors. This court simply did not engage in the sort of "divide-and-conquer" approach that our concurring colleague now alleges in perceiving a conflict between the *Mayo* and *R.W.* opinions. *Mayo* already steadfastly adhered to the principles since reaffirmed in *R.W.*, so that *R.W.* provides no occasion to reexamine *Mayo*'s analysis.

and to the entrances of three buildings in the complex.[3] They did not yell toward, point at, or otherwise signal to the group that they were coming for them. For all D.W. knew, those officers were going to one of the three apartment building entrances that were closer to the officers than he was, perhaps in response to a domestic dispute or other call.

In other words, while the facts in *Mayo* looked "nothing like" *Wardlow*, *id.* at 627,[4] the facts here look an awful lot like *Wardlow*, in which the court opined that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion." 528 U.S. at 124. The Supreme Court recently reiterated the point, noting that "'unprovoked flight upon noticing the police . . . . is certainly suggestive' of

---

[3] The division more modestly estimated that D.W. was "over fifty feet" away from the officers. *D.W.*, 339 A.3d at 178. While that is certainly true, it is also safe to say the officers were closer to 100 feet away even on a conservative estimate. A Google Maps overlay of the Geraldine complex and its accompanying scale are available here: https://perma.cc/DZ99-FRDY?type=image. They show that the walkway from the sidewalk to the building straight ahead, even before the left turn to the breezeway, is about 100 feet long. *See Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (taking "judicial notice of a Google map" and its estimated distance between two points as a "source[ ] whose accuracy cannot reasonably be questioned" (alteration in original) (quoting Fed. R. Evid. 201(b)); *Reed v. State*, 595 S.W.3d 391, 395 (Ark. Ct. App. 2020) (collecting cases and noting that "there seems to be an emerging consensus that courts can use Google Maps to establish the distance between two geographic points").

[4] One member of this majority did not participate in *Mayo*, and he doubts the court reached the right result after applying the relevant legal principles to the facts of that case. *See D.W.*, 339 A.3d at 186 (Glickman, J., concurring dubitante).

wrongdoing." *R.W.*, 146 S. Ct. at 1072 (quoting *Wardlow*, 528 U.S. at 124). Here, D.W. "took one look at police officers" who were at a considerable distance from his group "and ran" before they had indicated any particular focus on him. *See Mayo*, 315 A.3d at 627-28 (discussing *Wardlow*, 528 U.S. at 121-22). So in contrast to Mayo's flight, D.W.'s headlong flight could far more "reasonably [have been] interpreted by the officers as consciousness of guilt." *Id.* at 627.

We note two other factors that add some further support for the stop, though we attach significantly less weight to them: (1) the general locational crime evidence here was more particularized than it was in *Mayo*, both in its detail and in its geographical focus on this particular apartment complex (though it was still somewhat vague); and (2) D.W.'s protracted and treacherous flight evinced far more desperation than Mayo's brief dash away from converging officers before he was seized.

On the first point, we agree with D.W. that the officers' testimony that the Geraldine had a "reputation" as a high-crime area and was "known" for drug- and gun-related crimes should be given little to no weight. Those observations are on par with the bare and conclusory "high-crime" descriptors that we gave no weight to in *Mayo*. But there was quite a bit more here, and it was far more particularized to the Geraldine complex itself rather than to a boundary-less neighborhood, as in *Mayo*:

(1) Bewley testified that he had personally responded to reports at the Geraldine of "homicides, assault with dangerous weapon, guns, [and] knives"; (2) Bewley explained, when opining that the Geraldine is a high-crime area, that what he meant by that is it was an area where at least "five to ten" "violent crimes" occur per year; (3) Ewing had personally responded to complaints from residents about drug activity in front of the Geraldine; and (4) Ewing had recovered "numerous firearms [and] narcotics" and made "a lot of arrests" for firearms and narcotics at the complex. The officers did not offer any hard statistics to back up these assertions, which certainly could have added to their weight. But this testimony is still markedly stronger than the cryptic testimony in *Mayo* that "over 10 guns" were recovered in the boundary-less "Kenilworth area" across a three-year period. *Id.* at 636. It has at least some slight weight in the reasonable suspicion calculus, in our view.

On the second point, the desperation evinced by D.W.'s flight also adds some slight support in favor of the officers having reasonable suspicion for a seizure. Recall that D.W. led officers on an extended chase for approximately a minute in and around the Geraldine complex—through a parking lot, down an alley, through a yard, over a tall fence, and halfway over a second fence. That D.W. "went to such lengths" to escape the police made it even more reasonable for officers to infer that he was running not because of "mere fear" or an "ordinary desire to avoid police contact," but rather because of consciousness of guilt. *See Miles*, 181 A.3d at 644

(citing *Dalton v. United States*, 58 A.3d 1005, 1013 (D.C. 2013)); *see also Duhart v. United States*, 589 A.2d 895, 900 (D.C. 1991) ("[T]he circumstances of the suspect's efforts to avoid the police must be such as [to] permit a rational conclusion that flight indicated a consciousness of guilt." (quoting *In re D.J.*, 532 A.2d 138, 141 (D.C. 1987))).

We do not mean to overstate the point. If you are going to run away from the police in the first place—which an innocent person might do for "myriad reasons," *Miles*, 181 A.3d at 641—you are in some sense in for a penny, in for a pound, and will likely go to some lengths to get away. But the stakes of failing to escape surely inform how far you are willing to go. To illustrate the point, if a suspect flees across a heavily trafficked highway with speeding cars brushing just past him, there is far more reason to think he is seeking to evade arrest for a serious crime, rather than to avoid the considerable indignities of a brief stop and search. While scaling tall fences over the course of a protracted chase is not nearly so perilous as that, it does evince some desperation that, in our view, lends context and weight to the incriminating nature of D.W.'s flight. *See Dalton*, 58 A.3d at 1012-13 (concluding that the police had reasonable articulable suspicion to stop Dalton where, in addition to his unprovoked flight upon "noticing" the officers, he "abandoned his bicycle in a traffic lane and fled on foot onto the nearby sidewalk").

Considering (1) that D.W. fled immediately upon the mere sight of approaching officers, (2) the somewhat detailed and geographically particularized testimony about persistent crime at the Geraldine complex, and (3) the desperation evinced by the nature of D.W.'s flight, we conclude that officers had reasonable articulable suspicion to seize D.W. at the time Ewing grabbed his leg.

### C. D.W.'s and the Dissent's Counterpoints

D.W. and our dissenting colleague nonetheless implore us to consider the officers' frequent patrols at the Geraldine and the fact that some individuals there seemed conditioned to submit to the mere approach of officers. D.W. stresses that (1) both Bewley and Ewing agreed it was "typical" for some people at the complex to open their arms out in a T-shape or lift their shirts in response to officers; (2) Ewing said he had searched and chased people at the Geraldine before; (3) Bewley said he had searched the "crotch area" of some people before; and (4) Bewley agreed it was typical to handcuff suspects in public view for extended periods as officers canvassed the surrounding area. Those serious indignities visited upon at least some seemingly innocent people, D.W. argues, severely mitigate the incriminating weight one can reasonably attribute to his flight.

We take the point for what it is worth, but we are not convinced on this record that officers had engaged in such systemic provocation at the Geraldine that they

should have understood D.W.'s flight as more consistent with the "apprehensiveness that would naturally be felt" by someone in his shoes than with consciousness of guilt. *Mayo*, 315 A.3d at 632 (quoting *Dozier v. United States*, 220 A.3d 933, 942 (D.C. 2019)). Unlike the GRU in *Mayo*, there was no testimony that the Crime Suppression Team had a broadly known reputation for using aggressive tactics or was specifically known among Geraldine residents for using those tactics, *see id.* at 631 (noting the GRU's "reputation" and the trial court's findings that Mayo's group "knew" about the GRU), and we cannot infer such widespread abuse on the record before us. While our dissenting colleague asserts there was "undisputed evidence" that the Crime Suppression Team employed what she views as "aggressive" police tactics at the Geraldine, *post* at 50, in fact no witness—only our colleague—described their tactics that way. That is unsurprising given that the defense did not present any witnesses of its own to testify about the policing methods used at the Geraldine, or the residents' reactions to them. That record comes strictly from Officers Ewing and Bewley, who described heavy policing in an area that seemed to call for it—that is, a heavy police presence at a distinct complex that was rife with crime, with the frequent patrols regularly yielding arrests for serious crimes.[5]

---

[5] The defense did present an investigator who testified about the prevalence of homicides near the Geraldine in the three years before D.W.'s arrest. But that investigator rather curiously—one might say conspicuously—searched only for data

D.W. and our dissenting colleague counter that three of the other thirteen people outside the Geraldine that day—twelve Black males and one Black female—responded to the officers' approach in a manner suggesting that people at the Geraldine regularly experienced aggressive policing: (1) one man by the breezeway lifted his shirt as Bewley and Gendelman ran past him after D.W. (four men in that area had no obvious reaction to the officers' approach); (2) the "man in the blue shirt" also fled through the breezeway just as D.W. had, despite officers recovering no guns or drugs on him or in his flight path; and (3) one man placed his arms in a T-shape after some unknown verbal exchange as Ewing approached him (five men and one woman in Ewing's vicinity had no obvious reaction to his approach).

That is surely some evidence that police had used heavy-handed tactics at the Geraldine, or in policing the District's Black residents more generally. *See Dozier*, 220 A.3d at 944 (noting that Black individuals might have a "particularly justified" fear of police that can mitigate the incriminating weight of their flight). We agree in principle with our dissenting colleague that this at least slightly mitigates the incriminating nature of D.W.'s flight, but it does not drag the totality of circumstances below the reasonable suspicion bar. Notably, the significant majority of people at the Geraldine just went about their business when the officers

___

on homicides in that area, and offered no testimony about other violent crimes or the frequency of arrests for illegal guns and drugs in the area.

approached, in contrast to *Mayo*, where everybody in the area dispersed upon the GRU's arrival. *See* 315 A.3d at 622. As for the one other person who fled—the man in the blue shirt—while it appears that no incriminating evidence was found on him or in his flight path, that does not mean he was "innocent," as our dissenting colleague declares. *Post* at 50. He did not testify as to his innocence, nor did anybody else, and we cannot entirely discount the possibility that he successfully ditched some contraband as he fled, or that he was worried the police were looking for him in relation to some past offense for which there was no evidence on his person. Putting those possibilities aside, we have already factored in that perfectly innocent people may run from the police, with the man in the blue shirt likely among them. That fact does not make flight wholly innocuous, and on these facts, the flight was sufficiently incriminating to do the heavy lifting in the reasonable suspicion calculus. *See Mayo*, 315 A.3d at 625 ("[H]eadlong flight . . . is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." (quoting *Wardlow*, 528 U.S. at 124)).

We acknowledge that there are many affluent neighborhoods in the District where it is rather unlikely that any innocent individual would flee, display their waistband, or put their arms out to their sides upon the mere approach of police officers. Officers and courts alike should be mindful of that dynamic and cognizant that in heavily policed areas like the Geraldine, innocent people might be especially

prone to run from the police, both to avoid the severe indignities of an unjustified search and seizure and out of fear of being victims of police violence. *See Dozier*, 220 A.3d at 944; *Miles*, 181 A.3d at 641. But on balance, factoring that into our assessment of reasonable suspicion, D.W.'s flight upon the mere sight of officers potentially approaching his group at a distance with no indication that he would be targeted, coupled with the testimony about the prevalence of crime in the Geraldine in particular and the desperate nature of his flight, sufficed to provide officers with reasonable suspicion to seize D.W. *See Mayo*, 315 A.3d at 620.

Finally, D.W. relies heavily upon *Posey* as compelling the opposite result, as the division in this case did.[6] *D.W.*, 339 A.3d at 182-83. Both the division and D.W. focus on a sentence from *Posey* in which this court explained that "a nondescript individual distinguishing himself from an equally nondescript crowd by running away from officers unprovoked does not, without more, provide a reasonable basis for suspecting that individual of being involved in criminal activity and subjecting him or her to an intrusive stop and police search." 201 A.3d at 1204. We agree that

---

[6] Two members of the division wrote separately to explain that, while they believed *Mayo* and *Posey* compelled a reversal, they would have affirmed were they not bound by their understanding of those precedents. *D.W.*, 339 A.3d at 183 (McLeese, J., concurring); *id.* at 186 (Glickman, J., concurring dubitante).

this statement is true in many contexts.[7] But to the extent *Posey* announced it as a hardline rule—as the division read it—that is at odds with *Mayo* so it no longer has any force. *See Mayo*, 315 A.3d at 625 ("A defendant's flight, just like any other factor in our comprehensive analysis . . . is viewed in the context of the specific facts and corroborating circumstances of each individual case."). Flight never occurs in a vacuum, and the surrounding context of the flight here rendered D.W.'s flight sufficiently incriminating to furnish the reasonable suspicion necessary to justify his seizure.

## III. Conclusion

For the foregoing reasons, we affirm D.W.'s convictions.

---

[7] We add one caveat to *Posey*'s language, which is that it is generally unilluminating to refer to flight in the binary terms of "provoked" and "unprovoked," because provocation is always a matter of degree. In some sense, officers could be said to "provoke" people to flee just by arriving in an area, though the degree of provocation increases as officers approach particular individuals and ask accusatory questions, and increases even more where the officers' actions indicate that some individual(s) are in fact not free to go about their business, as was the case in *Mayo*. Notably, the context in *Posey* was that officers had pulled their marked cruiser up to "within fifteen feet" of a group they suspected of participating in an armed robbery in the area some unknown period of time earlier. 201 A.3d at 1200. While *Posey* did not go into detail about the nature of the flight, the record is clear that Posey's was a quick dash to the door of a nearby apartment building—which, for all the officers knew, was Posey's residence—where officers then seized him. The nature of that "flight" is not as incriminating as D.W.'s protracted flight upon the mere sight of officers at a considerable distance from him.

*So ordered.*

MᴄLᴇᴇsᴇ, *Associate Judge*, concurring in the judgment: The court holds that the police had reasonable, articulable suspicion to stop D.W. based on the combination of three circumstances, the latter two of which provide only "slight" support, *ante* at 20: (1) D.W. fled "upon the mere sight of officers headed in his general direction from a substantial distance," *ante* at 11; (2) there was particularized evidence about prior criminal activity in the specific apartment complex where D.W. was standing, *ante* at 19-20; and (3) D.W.'s efforts to climb fences reflected a level of desperation that added to the suspiciousness of his flight, *ante* at 20-21. I agree with the court's ultimate holding that the stop in this case was lawful, but my reasoning differs from that of the court on several significant points. I therefore respectfully concur only in the judgment.

1. The opinion for the division in this case held that the police did not have an adequate basis for the stop. *D.W. v. United States*, 339 A.3d 175 (D.C.), *vacated and reh'g granted en banc*, 341 A.3d 27 (D.C. 2025). In sum, the division reasoned that (1) although the evidence of prior criminal activity in the area was slightly stronger in this case than in our recent en banc decision in *Mayo v. United States*, 315 A.3d 606 (D.C. 2024) (en banc), that evidence nevertheless was "weak tea at best" under the reasoning of *Mayo*, *D.W.*, 339 A.3d at 182 (citation modified); (2) the

evidence of flight in this case was not by itself sufficient to support a conclusion of reasonable, articulable suspicion under the holding of *Posey v. United States*, 201 A.3d 1198 (D.C. 2019), that unprovoked flight does not by itself justify a stop, *D.W.*, 339 A.3d at 182-83; and (3) although relevant, D.W.'s fence-climbing did not warrant a result different from our holdings in *Mayo* and *Posey* because "[a]n innocent individual who feared police brutality or harassment or over-aggressive police conduct might well reflect that fear by taking measures such as [climbing] fences," *id.* at 183 (citation modified).

I wrote a concurring opinion in *D.W.*, explaining that I was bound by *Mayo* even though in my view the decision in *Mayo* "was incorrect and has set this court on a path that is contrary to the directions we have been given by the Supreme Court." *D.W.*, 339 A.3d at 186 (McLeese, J., concurring).

2. The opinion for the en banc court "reaffirm[s] the principles articulated by" *Mayo*. *Ante* at 16. I dissented in *Mayo*, 315 A.3d at 639-58 (McLeese, J., dissenting), and now that we are en banc again we are not bound by *Mayo*. I see no need to repeat in detail all of the points I raised in dissent in *Mayo*. I do, however, emphasize one concern that I raised in that dissent: that the opinion for the court in *Mayo* erroneously "utilize[d] a divide-and-conquer analysis by evaluating and

rejecting factors in isolation rather than considering factors collectively." *Id.* at 645 (citation modified).

Recently, the Supreme Court summarily reversed this court's decision in *In re R.W.*, 334 A.3d 593 (D.C. 2025), which had held that the police lacked reasonable, articulable suspicion to support an investigative stop. *District of Columbia v. R.W.*, 146 S. Ct. 1069 (2026) (per curiam). The Supreme Court held that this court erred by undertaking a "divide-and-conquer analysis" rather than considering "the whole picture." *Id.* at 1072 (citation modified). In my view, the Supreme Court's decision in *R.W.* demonstrates that this court should be reconsidering *Mayo* rather than reaffirming it.

The opinion for the en banc court denies that *Mayo* took an impermissible divide-and-conquer approach. *Ante* at 16-17 n.2. In my view, that denial is inaccurate. *Mayo* first considered flight as a factor by itself and concluded that the value of the evidence of flight in the case was "significantly reduced" because the police "could not reasonably perceive Mr. Mayo's flight as *clearly* reflecting consciousness of guilt; rather it is more consistent with the apprehensiveness that would naturally be felt by a person in his situation." *Mayo*, 315 A.3d at 632 (emphasis added and citation modified). As I explained in dissent in *Mayo*, however, "I do not see how a potentially suspicious factor (here flight) can appropriately be

given little weight in the totality-of-the-circumstances analysis simply because that factor itself is not 'clearly' incriminating." *Id.* at 645 (McLeese, J., dissenting). "[R]easonable, articulable suspicion is based on the totality of the circumstances. It necessarily follows that individual factors cannot properly be given little weight because in isolation they are not clearly incriminating." *Id.*

The consideration of general locational crime evidence in *Mayo* was similarly flawed. In discussing that factor, *Mayo* stated that "to be of value in a reasonable articulable suspicion analysis, information about crime in the area must be particularized as to the location or geographic area at issue, the criminal activity known to occur in the area, and the temporal proximity of the criminal activity known to occur in the area to the time of the stop." 315 A.3d at 635 (citation modified). As I explained in dissent in *Mayo*, however, "binding Supreme Court authority precludes this court from imposing such particularity as a rigid prerequisite before such information may be given any weight at all in a totality-of-the-circumstances analysis." *Id.* at 651 (McLeese, J., dissenting).

Thus, *Mayo* considered flight and general locational crime evidence in isolation and imposed as to each factor a threshold requirement before the factor could be given significant weight in a totality-of-the-circumstances analysis. The opinion for the en banc court in this case does not dispute that *Mayo* imposed

threshold requirements for the consideration of those factors, but defends those threshold requirements as merely demanding that evidence be "relevant and non-conclusory." *Ante* at 16-17 n.2 (citation modified). I do not find that defense at all persuasive. *Mayo*'s requirement that flight must clearly reflect consciousness of guilt before it can be given significant weight was not based on considerations of relevance. *Mayo*, 315 A.3d at 624-32. To the contrary, *Mayo* acknowledged flight's general relevance, *id.* at 624-25, and never suggested that flight evidence is inadmissible on grounds of relevance unless the threshold requirement is met, *id.* at 624-32. Nor could *Mayo*'s threshold requirement reasonably have been based on relevance grounds, given that "[t]he test for relevance is not a particularly stringent one," requiring only that the evidence at issue "tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Toyer v. United States*, 325 A.3d 417, 422 (D.C. 2024) (citation modified).

Similar points can be made about *Mayo*'s requirement that, "to be of value," "information about crime in the area must be particularized" in each of three specific ways. *Mayo*, 315 A.3d at 635 (citation modified). The court in *Mayo* explicitly stated that the general locational crime evidence introduced in the case was "relevant," *id.* at 636, but then went on to give that evidence no weight because the evidence flunked the *Mayo* court's three-part particularity requirement, *id.*

The threshold requirements established in *Mayo* were imposed as a matter of substantive Fourth Amendment law. Reconceptualizing them as reflecting principles of evidentiary admissibility, as the opinion for court in this case suggests, would be a sweeping and unwarranted expansion of *Mayo*.

The opinion for the court also implies that the threshold requirements imposed in *Mayo* are supported by the principle that investigative detentions must have a "particularized and objective basis." *Ante* at 16-17 n.2 (quoting *R.W.*, 146 S. Ct. at 1071 (citation modified)). As the Supreme Court has repeatedly made clear, however, the question whether officers had an adequate basis for an investigative detention must be determined based on the totality of the circumstances, *i.e.*, "the whole picture." *R.W.*, 146 S. Ct. at 1073 (citation modified). Requiring that each separate factor relied on by the police must itself be "particularized" in some sense, or must meet some other categorical threshold, is contrary to that basic principle of Fourth Amendment law.

It is true that *Mayo* did not simply establish threshold requirements. *Mayo* also discussed other factors and then included a paragraph briefly discussing the various factors in *Mayo* "collectively." 315 A.3d at 637. That brief discussion, in my view, did not cure the problems I have noted. The *Mayo* court's discussion of the factors collectively was skewed by the court's prior imposition of requirements that flight

and general locational crime evidence must meet certain thresholds in isolation before they can be given significant weight in the totality-of-the-circumstances analysis. Incorrectly reducing factors to categorical insignificance in isolation is a way of "dividing and conquering" factors the significance of which must in the end be properly considered collectively. Relatedly, the brief discussion of the totality of the circumstances in *Mayo*, like the opinion in *Mayo* as a whole, does not acknowledge, much less give effect to, the principle that "the whole is often greater than the sum of its parts." *R.W.*, 146 S. Ct. at 1072 (citation modified).

To be clear, I do not object to courts initially considering the general significance of individual factors before considering the totality of the circumstances. *Post* at 44-49 (Beckwith, J., dissenting). For the reasons I have stated, however, I conclude that the *Mayo* court erred by incorrectly reducing certain factors to categorical insignificance in isolation and then giving those factors little or no weight in assessing the totality of the circumstances.

In my view, the errors I have just noted led the court in *Mayo* to reach a conclusion that is contrary to the Supreme Court's holding in *Illinois v. Wardlow*, 528 U.S. 119 (2000), and inconsistent with the overwhelming weight of authority from other courts around the country. *Mayo*, 315 A.3d at 654-57 (McLeese, J. dissenting).

For the foregoing reasons, the court in *Mayo* should have upheld the legality of the stop at issue, which like the stop in this case was of a suspect who fled from the police in an area as to which the police had substantial information about prior criminal activity. *Id.* at 639-40. I agree with the court in this case that, on balance, the police had a stronger basis for the stop in this case than in *Mayo*. *Ante* at 16-20. It follows that in my view the stop in the present case was lawful.

3. The division in this case was also bound by *Posey*, but now that we are en banc we are free to reconsider *Posey*. I believe that *Posey* also was incorrectly decided. In *Posey*, police officers received a lookout for an armed robbery in the unit block of M Street, N.W. 201 A.3d at 1200. One suspect was described as "a black male dressed in all black." *Id.* A second lookout reported that the robbery involved a group of black males who were last seen heading toward North Capitol Street. *Id.* Officers arrived at the unit block of M Street about five or ten minutes after the second lookout was received. *Id.* at 1201. The officers saw a group of five or more black males, mostly dressed in black, walking in the block and towards North Capitol Street. *Id.* at 1200. The officers drove their car to within fifteen feet of the group, and Mr. Posey took off running. *Id.*

The court in *Posey* held that the officers lacked reasonable, articulable suspicion to stop Mr. Posey. 201 A.3d at 1202-05. The court reasoned as follows:

(1) the lookout description of the suspects' appearance and clothing was generic; (2) there was no evidence of how much time passed between the commission of the robbery and the lookouts; (3) the police officers themselves did not observe any illegal conduct by the group; (4) evidence that the stop occurred in a "high crime neighborhood" had "no real significance"; and (5) although Mr. Posey's flight was "unprovoked," there was "no indication" that the flight "added anything" because officers did not see Mr. Posey do anything illegal before or during the flight. *Id.* at 1202-04. The court summed up its holding as follows: "a nondescript individual distinguishing himself [or herself] from an equally nondescript crowd by running away from officers unprovoked does not, without more, provide a reasonable basis for suspecting that individual of being involved in criminal activity and subjecting him or her to an intrusive stop and police search." *Id.* at 1204.

I believe that the decision in *Posey* is incorrect in a number of respects. First, the court erred in giving "no real significance" to evidence that the stop occurred in a specific area that was notorious for crime and had a lot of shootings, as well as homicides and an open-air drug market. *See Posey*, 201 A.3d at 1203. Second, the court erred in concluding that the "unprovoked" flight in that case added nothing. *Id.* at 1204. Third, the court erred in concluding that, taken together, the information the police had was insufficient to give rise to reasonable, articulable suspicion justifying a stop. *Id.* On each of those three points, *Posey* in my view conflicts

directly with the Supreme Court's decision in *Illinois v. Wardlow*, 528 U.S. 119 (2000), in which the Court upheld the legality of a stop based solely on a suspect's "unprovoked" headlong flight from the police in a "high crime area." 528 U.S. at 124.

*Posey* also conflicts with the Supreme Court's decision in *R.W.* because *Posey* reflects the same divide-and-conquer approach that the Supreme Court once again rejected in *R.W. See, e.g., Posey*, 201 A.3d at 1203-04 (considering in isolation evidence that stop occurred in "high crime neighborhood," dismissing that evidence as having "no real significance," and then failing to take that evidence into account when discussing totality of circumstances).

Finally, the court in *Posey* cited no comparable case in which any court has held a stop unlawful, and I am aware of no such case. To the contrary, I cited in dissent in *Mayo* numerous decisions from courts around the country upholding stops based on substantially less information than was present in *Mayo* and *Posey*. *Mayo*, 315 A.3d at 656-57 (McLeese, J., dissenting) (citing cases). In my view, the Supreme Court's decision in *R.W.* is another such case. In that case, the police received a radio dispatch call concerning a "suspicious vehicle" at a particular address. *R.W.*, 146 S. Ct. at 1070. When an officer arrived at that address at around 2 a.m., he saw two people flee, "unprovoked," from a parked car. *Id.* Although at least one of the car's

rear doors was open, the driver began to back out of the parking space. *Id.* The Supreme Court held that that information "clearly" established reasonable, articulable suspicion supporting the stop of the driver. *Id.* The information available to the police in *Posey* was quite a bit stronger than the information available to the police in *R.W.* It follows that this court erred in *Posey* by holding that the police lacked reasonable, articulable suspicion.

4.  In my view, the court in this case should acknowledge that *Mayo* and *Posey* were incorrectly decided and should bring our law in this area into conformity with the direction we have been given by the Supreme Court and into better consistency with the decisions of other courts around the country. I am concerned that our failure to do so will lead the Supreme Court in the future to reverse this court yet again.

5.  As previously noted, the court in this case instead "reaffirm[s]" *Mayo*. *Ante* at 16. I do not agree with that step, but at least it is not inconsistent with the court's affirmance in this case. As I have noted, the information available to the police in this case is on balance somewhat stronger than was available to the police in *Mayo*, so the court can reasonably affirm here despite the reversal in *Mayo*. In my view, however, the same is not true of *Posey*. Taken together, the information available to the police in *Posey* was substantially stronger than the information available to the

police in this case. If *Posey* is correctly decided, then the court should hold that the police in this case lacked reasonable, articulable suspicion.

6. Although the opinion for the en banc court in this case does not explicitly acknowledge that *Posey* was incorrectly decided, the opinion for the en banc court does not defend the outcome of *Posey*. *Ante* at 26-27. The opinion for the en banc court also does not dispute that *Posey* is inconsistent with the Supreme Court's decision in *R.W.* and is another case in which this court has taken an impermissible divide-and-conquer approach. *Id.* Rather, the court limits *Posey* in one respect, criticizes the terminology the court used in *Posey*, and attempts to distinguish *Posey*. *Ante* at 26-27 & n.7. I am not persuaded by any of those lines of reasoning.

a. The division in this case understood *Posey* to have held that "unprovoked" flight by itself does not suffice to provide reasonable, articulable suspicion justifying a stop. *D.W.*, 339 A.3d at 182-83. The en banc court in this case does not take a position as to whether that is a correct reading of *Posey*. *Ante* at 26-27. Rather, the court holds that if *Posey* announced such a rule, that rule was overturned by the statement in *Mayo* that the significance of flight "depends on context." *Ante* at 13-14 (quoting *Mayo*, 315 A.3d at 626), 26-27. I do not understand the reasoning of the court on this point. Requiring a factor to be understood in context does not seem to me to be necessarily inconsistent with concluding that the factor by itself cannot

suffice to establish reasonable, articulable suspicion. For example, evidence that a stop took place in a neighborhood in which there had been substantial criminal activity in the past must be considered in context, but I assume that the court would agree that such evidence cannot, without more, establish reasonable, articulable suspicion.

I thus see no inconsistency between anything in *Mayo* and what I take to be the holding of *Posey* that "unprovoked" flight, without more, does not suffice to establish reasonable, articulable suspicion. *Posey*, 201 A.3d at 1204. The en banc court in *Mayo* also does not seem to have perceived any such inconsistency because it repeatedly relied upon *Posey* in its analysis. *Mayo*, 315 A.3d at 621-22, 625, 637.

b. The court criticizes *Posey* for using "unilluminating" "binary" terminology in referring to flight as "unprovoked" or "provoked" because provocation is a matter of degree. *Ante* at 27 n.7. I agree that it is a matter of degree to what extent police presence or conduct that occurs before a suspect's flight should be viewed as weakening the reasonableness of the police's inference that the flight may reflect consciousness of guilt rather than some other innocent reason. *See Mayo*, 315 A.3d at 646-47 (McLeese, J., dissenting). It can be a little unwieldy, however, to express that thought with perfect accuracy. The problem is not only that the issue is one of degree. In addition, the precise issue is not whether a particular suspect's flight in

fact was to some degree provoked by police presence or conduct. Rather, the precise issue is to what extent the police at the relevant time should have understood that their presence and conduct might have affected the degree to which a suspect's flight can reasonably be viewed as suspicious. In other words, it is potentially misleading to focus on whether flight actually was or was not "provoked" to some degree. Rather, the focus should be on the extent to which the police should have understood that their presence and conduct might have affected the likelihood that flight was innocent rather than reflective of consciousness of guilt.

    c.   The court in this case appears to attempt to distinguish *Posey* in three factual respects. First, the court accurately notes that the police car in *Posey* was within fifteen feet of the group including Mr. Posey, whereas the police in the present case were more than fifty feet away from the group including D.W. *Ante* at 18 n.3, 27 n.7. I do not believe that this relatively minor difference in distance is of material significance, but in any event the difference in my view is outweighed by the fact that in the present case the police had gotten out of their car and were walking toward the group including D.W., *ante* at 2, whereas in *Posey* the officers had not opened their car doors or made any other demonstration that it was their intent to approach the group including Mr. Posey. In my view, D.W. had at least as strong a reason as Mr. Posey had to fear that the police might have been focused on him.

Second, the opinion for the court indicates that the flight in *Posey* was shorter in distance and duration than the flight in this case. *Ante* at 27 n.7. Here too the differences are minor, given that the flight in the present case lasted only about a minute. The opinion for the court does not explain, and I do not see, why such minor differences in distance and duration would make a material difference to the degree to which officers could have viewed flight in both cases as suspicious.

Third, the opinion for the court relies on the fact that D.W. climbed over one fence while fleeing and attempted to climb over another. *Ante* at 20-21. The opinion for the court does not rely heavily on this point, stating that it provides only "some slight support" for a conclusion that the stop in this case was lawful. *Id.* at 20. I agree that D.W.'s fence-climbing has some minor relevance, but I think that the opinion for the court overstates the relevance of that consideration in this case. For one thing, the opinion for the court substantially underestimates the nature and magnitude of the fears that this court has indicated young men of color might reasonably have about encounters with the police. The opinion for the court briefly acknowledges "the severe indignities of an unjustified search and seizure." *Id.* at 26; *see, e.g.*, *United States v. Street*, 917 F.3d 586, 592 (7th Cir. 2019) ("An investigative stop under *Terry* imposes a substantial intrusion on a person's liberty and dignity."); *cf. Berkemer v. McCarty*, 468 U.S. 420, 436 (1984) (traffic stop "significantly curtails the freedom of action of the driver and the passengers") (citation modified). More

concretely, during a *Terry* stop of an individual, the police by definition restrain the individual's freedom of movement. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). If the circumstances make it reasonable to do so, officers during a *Terry* stop may also (1) use physical force to seize the individual, *id.* at 28; (2) conduct a limited search, i.e., a frisk, of the individual's person for weapons, *id.* at 25-26; and (3) place the individual in handcuffs, *Womack v. United States*, 673 A.2d 603, 608-10 (D.C. 1996). A *Terry* stop must be reasonable in duration, but such stops can permissibly last for a significant time. *Compare McIlwain v. United States*, 568 A.2d 470, 473 (D.C. 1989) (upholding *Terry* stop lasting thirty minutes), *with United States v. Place*, 462 U.S. 696, 709-10 (1983) (holding that, under circumstances, *Terry* stop lasting ninety minutes was unreasonably long).

More importantly, our recent opinion in *Carter v. United States*, 341 A.3d 1067 (D.C. 2025), *cert. denied*, No. 25-885, 2026 WL 1780409 (U.S. June 22, 2026), emphasizes that the reasonable fears at issue are not limited to being unjustifiably subjected to a stop. Rather, those fears include fear of being treated in a racially discriminatory manner during such stops and being victims of unjustified police violence including the use of fatal force. *Id.* at 1076-80. When this court's assessment of the gravity of suspects' reasonable fear is taken into account, it seems quite unsurprising that a suspect fleeing out of fear would be willing to climb a fence to try to avoid the police.

I have one further concern about the opinion for the court's reliance on D.W.'s fence-climbing. D.W. was clearly aware that the police were chasing him before he climbed the first fence. Moreover, unless the officers had reasonable, articulable suspicion before D.W. climbed the first fence (which the court in this case does not hold), the officers at that point should have been aware that they were chasing D.W. without a lawful basis for doing so. Seemingly, under the court's own analysis, that police conduct "substantially reduc[ed] the incriminating value of [D.W.'s fence-climbing] in the reasonable suspicion calculus." *Ante* at 15. The opinion for the court neither acknowledges nor addresses this concern.

For the foregoing reasons, I respectfully concur only in the judgment.

BECKWITH, *Associate Judge*, dissenting: For the reasons below, I disagree with the court's holding that the police in this case had reasonable suspicion to stop D.W. But at the outset—and in part to help frame my own take on the reasonable suspicion question—I turn to my concurring colleague's objection to this court's en banc decision in *Mayo v. United States*, 315 A.3d 606 (D.C. 2024) (en banc), and thus to the majority's decision today to reaffirm *Mayo*, for employing what the Supreme Court has deemed an illicit "divide-and-conquer" approach to Fourth Amendment analyses. *Ante* at 29-30 (McLeese, J., concurring in the judgment) (citing *District of Columbia v. R.W.*, 146 S. Ct. 1069, 1072 (2026) (per curiam)).

The part of *Mayo*'s analysis that Judge McLeese describes as "divide and conquer" takes a factor-by-factor approach and then considers all of the factors together at the end. Judge McLeese says that he does not object to courts initially discussing factors one by one, *ante* at 34, and indeed, courts routinely engage in an "evaluation" of each factor's probative value in isolation before finally looking at the factors as a whole at the end. *See, e.g.*, *District of Columbia v. Wesby*, 583 U.S. 48, 57-60 (2018) (separately discussing multiple factors bearing on probable cause before concluding that, "[v]iewing these circumstances as a whole, a reasonable officer could conclude that there was probable cause"). He instead appears opposed to a court reaching a preliminary estimate about the probative value of each individually discussed factor—not about whether there was reasonable articulable suspicion—prior to discussing the factors as a whole. *See ante* at 34 (taking issue with "reducing certain factors to categorical insignificance in isolation"). But even the recent Supreme Court decision Judge McLeese relies upon, *District of Columbia v. R.W.*, "evaluat[es]" the probative value of flight in isolation—describing how probative of suspicion flight is *in general*—when it notes that "unprovoked flight upon noticing the police . . . . is certainly suggestive" of wrongdoing.[1] 146 S. Ct. at

---

[1] Indeed, "[a]ny readable [reasonable-suspicion] analysis will, of necessity, tick through factors, finding some weighty, others less so, and still others not at all, before piling them on a scale and assessing the result." *R.W.*, 146 S. Ct. at 1073

1072 (omission in original) (internal quotation marks and citations omitted); *see also id.* (noting that R.W.'s car passengers' flight, assessed in isolation, "cast [R.W.'s] presence in a suspicious light"). Viewed in the light of additional facts, a suspect's flight might be much more or less suspicious. If the suspect had a large bulge in his waistband, then his flight looks more suspicious. If the police had just beat up the suspect's friend for no reason, then his same flight looks more innocent.

Not only is this factor-by-factor approach routinely used by courts, including the Supreme Court, but there is nothing wrong with it, as long as the analysis ultimately views all relevant facts collectively. It may well be true that headlong flight in a high-crime area—when no other facts are known—is generally indicative of criminal activity. It may also be true that headlong flight in a high-crime area where the fleeing person has specific reasons to fear that police will subject him to violence or an unlawful search—when no other facts are known—is generally not indicative of criminal activity. Both of these statements can be simultaneously true because they are estimates based on different sets of facts. Put differently, they might be called different "base rate" estimates based on broader or narrower "reference

---

(Jackson, J., dissenting) (noting that "[t]o its credit," the majority in *R.W.* "applie[d] a similar, factor-by-factor approach").

classes."[2] *See, e.g.*, Koehler & Shaviro, *supra* note 2, at 247 n.2, 252-53, 258-59 (1990). A court's estimate of the probability someone is engaged in wrongdoing should ultimately reflect all relevant facts fairly raised by the parties, rather than only some of those facts. *See id.* at 259 (explaining that a reference class is unspecific where "it reflects fewer seemingly important features of the case at hand"). As long as the court ultimately considers all such relevant factors, it is appropriate—indeed, the most natural way to go about the analysis—for a court to first note the base rate for a broad reference class (for example, the chance that someone "engaged in headlong flight" is likely engaged in criminal activity) and narrow its analysis from there once additional facts are added.

---

[2] A "base rate" is the estimation of the probability of a condition or event occurring. *See* Jonathan J. Koehler & Daniel N. Shaviro, *Veridical Verdicts: Increasing Verdict Accuracy Through the Use of Overtly Probabilistic Evidence and Methods*, 75 Cornell L. Rev. 247, 247 n.2 (1990) ("Base rates describe the frequency with which a relevant attribute occurs among members of a reference population. A base rate may also be thought of as the probability that a randomly selected member of a reference population will have the relevant attribute."); *id.* at 252-53. To illustrate, outside the Fourth Amendment context a "base rate" might refer to the percentage of women who have breast cancer or the percentage of teenage boy drivers involved in car crashes. Each "base rate" has what is called a "reference class"—in the preceding examples, the reference classes are "women" and "teenage boy drivers." *See id.* at 259-60. But if you pick a different reference class, the base rate changes. If you instead pick the reference class "women over fifty who have inherited the BRCA gene mutation," for example, the base rate of breast cancer is higher. If you pick the reference class "teenage boy drivers who are nineteen and former Boy Scouts," the car crash rate might be lower. And so on.

Of course, the parties might disagree on which, and how many, facts are relevant—that is, what reference class should be used in determining the likelihood of criminal activity. In any given case, a party might argue that we should not merely be looking broadly at what percentage of "people who run from officers in headlong flight" are engaged in wrongdoing, but more narrowly at what percentage of "people who are young Black men and who have seen their peers be stopped or searched or otherwise harassed by these particular officers for no reason in this same apartment complex who run in headlong flight" are engaged in wrongdoing. Or perhaps "people who have a bulge in their pocket who run from officers in headlong flight at 2 a.m. in an area where there were recently five shootings." One could theoretically narrow the reference class further and further by adding more and more facts until it is a class of one—a young man named D.W. who is of a certain age, who lives at a certain address, and who was wearing certain clothes and has a certain life history. Some of those facts might be irrelevant. Some might never be known. *See R.W.*, 146 S. Ct. at 1074 (Jackson, J., dissenting) ("[T]oday's per curiam necessarily omits a number of facts the Court finds insignificant—e.g., the make and model of the car, the precise location of the stop, the color of R.W.'s friends' clothing."). The point is, all base rates, however narrow the reference class (unless

it is a class of one), are simply estimates based on a limited number of facts. But that does not make them inaccurate or unhelpful.[3]

Turning to the circumstances of this case, I largely agree with the comparatively little weight the majority gives to the character of D.W.'s flight and the locational crime evidence, but my disagreement with the significant weight the court assigns to the fact that D.W. fled at all leads me ultimately to assess the totality

---

[3] Judge McLeese criticizes the *Mayo* opinion for engaging in illicit dividing and conquering by imposing a "threshold requirement" for high-crime evidence when it stated that "to be of value in a reasonable articulable suspicion analysis, information about crime in the area must be particularized as to the location or geographic area at issue, the criminal activity known to occur in the area, and the temporal proximity of the criminal activity known to occur in the area to the time of the stop." *Ante* at 31-32 (quoting *Mayo*, 315 A.3d at 635). But as the court in *Mayo* explained, the general locational crime data supplied in that case was not "sufficiently specific or well-grounded to place Mr. Mayo's innocuous conduct in a different light or make his flight more indicative of consciousness of guilt" given its deficiencies. *Mayo*, 315 A.3d at 636. That is not dividing and conquering. The court made sure to consider the high-crime testimony in context with Mr. Mayo's flight and other behaviors, and held that it did not help the facts rise to the level required by the Fourth Amendment. To have concluded otherwise would have been to permit officers to "affix[] . . . a dangling comparative label of 'high crime' to certain city blocks or even entire neighborhoods" and therefore deprive defendants of the rigorous Fourth Amendment analysis they are owed. *Id.* at 633 ("[T]he police must have individualized, particularized suspicion in order to conduct a *Terry* stop."). Just as one might reasonably conclude it is not worth recalculating the base rate for breast cancer when one learns that a woman over fifty who had inherited the BRCA gene mutation had *also* smoked one cigarette in her life, *see supra* note 2, the court in *Mayo* appropriately downplayed what it viewed as weak locational crime evidence. *Mayo* did not excise the factor as if it did not exist. Like the import of the single cigarette, the effect of the additional evidence is not zero, and it does create a new reference class—it just does not add anything appreciable to the analysis.

of the circumstances differently. *See ante* at 16-22. The record in this case contains an unusually well-developed array of facts tending to decrease the suspiciousness of D.W.'s flight. This includes concrete and undisputed evidence that the Crime Suppression Team had previously employed tactics at the Geraldine that I view as aggressive, that an individual similarly situated to D.W. fled from the officers despite being innocent, and that two other individuals altered their behavior in a manner indicating that they did not feel free to avoid interacting with the police.

This court "has made clear that flight cannot imply consciousness of guilt in all cases." *Miles v. United States*, 181 A.3d 633, 641 (D.C. 2018) (internal quotation marks and citation omitted). And in *Mayo*—whose principles the majority today reaffirms, *ante* at 16—this court, sitting en banc, reinforced that a context-sensitive inquiry into the existence of reasonable suspicion is not only proper, but essential. 315 A.3d at 627. We recognized in *Mayo*, for example, that an individual may flee from police due to "a distaste for police officers based upon past experience" or a "fear of police brutality or harassment" rather than because he is engaged in illegal activity. *Id.* at 625 (quoting *Miles*, 181 A.3d at 641).

That context matters is not a new idea. The Supreme Court's decision in *Illinois v. Wardlow*, 528 U.S. 119 (2000), "did not articulate a rigid rule that all flight, regardless of context, supports a reasonable articulable suspicion calculus,"

*Mayo*, 315 A.3d at 627. And indeed, in its amicus brief in *Wardlow*, the United States' characterization of Wardlow's flight as "aberrational" and therefore "much more uncharacteristic of innocent persons" was an acknowledgement that if Wardlow's conduct were not, in fact, "much more uncharacteristic" of innocence, that could have compelled a different result. Brief for the United States as Amicus Curiae Supporting Petitioner at 19, *Illinois v. Wardlow*, 528 U.S. 119 (2000) (No. 98-1036); *see also* Transcript of Oral Argument at 29-30, *Illinois v. Wardlow*, 528 U.S. 119 (2000) (No. 98-1036) (counsel for the United States stating that "the individual always will have the opportunity to show that other contextual factors made it unreasonable for the police officer to infer guilt from the fact of . . . flight").

Here, the record contains the sort of context that transforms flight from aberrational to unsurprising—thus not meriting the substantial weight the majority accords it in the reasonable articulable suspicion calculus. As noted above, the evidence shows three individuals' reactions to the police arriving on the scene: a man in a blue shirt who took off running from the police just like D.W. did, a man who proactively lifted his shirt to show he was not carrying a firearm in his waistband, and a third man who put his arms in a T-shape as officers approached. Those reactions were given their own context by background evidence—undisputed officer testimony, in fact—that described police practices at the Geraldine more generally. Officers from the Crime Suppression Team testified, for example, that

people in the Seventh District had called the team "a jump-out" and that police had previously pulled up to the apartment complex with their car doors already open, poised to immediately exit the car upon stopping—as they did here. *Cf. Mayo*, 315 A.3d at 629 ("[S]uch a flashbang method of approaching and questioning a subject after jumping out of halting vehicles seem[ed] designed to produce . . . fear, which could lead either to temporary paralysis or flight." (internal quotation marks and citations omitted)). Other testimony established that it was typical for people to respond to officers' arrival at the Geraldine by lifting their shirt or lifting their arms into a T-shape. And when police officers searched men outside the Geraldine complex (something one officer said he did "many times"), it was also typical for them to subject those men to what the majority opinion agrees are serious indignities, *ante* at 26, including invasive searches of the "crotch area" and forcing handcuffed individuals to sit on the ground in full view of the public for up to an hour while officers searched the area.

In this case, the officers did not arrive at the Geraldine on the report of any crime or an alert from an acoustic gunshot detection system or ShotSpotter. They had gone to the Geraldine—as they had many times before—on routine patrol, in multiple cars, looking for illegal activity. But they did not see a bulge in D.W.'s pants. They did not say he was blading as if to conceal something. They did say he was holding his waistband while running, but the trial court discredited that

testimony. According to the officers' testimony, they knew their presence on those visits would often cause people to lift their shirts or hold their arms out, and that is what happened. And it is inferable—from an officer's testimony that officers yell to each other when somebody is running and his agreement that "[o]ne reaction men might have at the Geraldine" to the Crime Suppression Team pulling up is "[t]o run"—that they also knew that people would sometimes run in response to their presence, including people whose flight, like that of the man in the blue shirt, was not necessarily prompted by a guilty conscience.

The trial court called the reasonable suspicion question in this case "very close." I do not disagree. Evidence about the nature of D.W.'s flight and about crime at the Geraldine adds something to the calculus. The absence of evidence that the police were specifically targeting D.W. also tends to support the existence of reasonable suspicion. But considering these factors along with the evidence of the prior police practices at the Geraldine, the response of individuals on the scene to the Crime Suppression Team's arrival, and the absence of any bulge or blading or the like on D.W.'s part, I would conclude that D.W.'s flight, even in light of its nature and the crime levels at the complex, is insufficiently probative of guilt to justify the stop. Because the totality of the facts available to the officers did not rise to the level of reasonable articulable suspicion, I respectfully dissent from the majority's contrary conclusion.